1          UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
2

3  _____ )
UNITED STATES OF AMERICA,      ) No. 3:11-cr-00213-SRU-1
4                               )
              Plaintiff,       ) February 10, 2025
5  v.                          )
                               ) 10:13 a.m.
6  WILLIAM SCOTT VAN WYK,       )
                               ) 915 Lafayette Boulevard
7              Defendant.       ) Bridgeport, Connecticut
_____ )
8

9     FINAL HEARING RE REVOCATION OF SUPERVISED RELEASE

10  B E F O R E:

11          THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

12

A P P E A R A N C E S:

13

FOR THE GOVERNMENT:

14

       OFFICES OF THE UNITED STATES ATTORNEY
15       U.S. DEPARTMENT OF JUSTICE
          157 Church Street, 25th Floor
16          New Haven, CT 06510
          203-821-3767
17          Email: angel.krull@usdoj.gov
       BY:  ANGEL KRULL, AUSA
18

19  FOR THE DEFENDANT:

20       OFFICE OF FEDERAL PUBLIC DEFENDER
          10 Columbus Boulevard, 6th Floor
21          Hartford, CT 06106-1976
          (860) 493-6260
22          E-mail: anne_silver@fd.org
       BY:  ANNE SILVER, AFD
23

24

              Official Court Reporter:
25              Melissa J. Cianciullo, RDR, CRR, CRC
              (203) 606-1794

1          (CALL TO ORDER, 10:13 a.m.)

2          THE COURT:  Good morning.  We're here for the

3    continued revocation hearing in the matter of the

4    *United States v. William Van Wyk*.

5          Could I have appearances, please.

6          MS. KRULL:  Good morning, Your Honor.  Angel

7    Krull on behalf of the people of United States.

8          THE COURT:  Thank you.

9          THE PROBATION OFFICER:  Good morning, Your

10   Honor.  Kim Gorton from the United States Probation

11   Office.

12         THE COURT:  Thank you.

13         MS. SILVER:  Good morning.  Anne Silver from

14   the Federal Defender's Office on behalf of

15   Mr. Van Wyk who is seated with me here at counsel

16   table.

17         THE COURT:  Very good.  All right.  Well, I

18   think we postponed this to allow the government to

19   submit a sentencing memorandum.  They have done that,

20   I've reviewed it, and I'm happy to hear from both

21   sides.

22         Ms. Silver, do you want to begin?

23         MS. SILVER:  Yes.  And I assume that we will

24   take up sentencing and then the proposed amendments

25   to the conditions, or do you want me to address those

all together?

THE COURT:  Well, my thought is this:  We may want to have a separate hearing on the question of conditions of supervised release, that is, a modification hearing, regardless of what happens today.  You'll then have an opportunity to submit something in writing which really you haven't done yet, understandably haven't done yet.

MS. SILVER:  That's fine.  The only thing I want to note for the Court is that Mr. Van Wyk will have transportation problems once he's released from prison.  So I don't want to forestall the need for a revocation hearing, but I do just want to acknowledge -- or the modification hearing.  I just want to acknowledge the realities here that it is going to be very difficult for him to get to Bridgeport, although maybe we could do this at a reasonably soon date.

I think -- there are only a few things that I think we would have significant disputes over.  Most of the conditions that are being proposed are duplicative or in line with what's already in his conditions.  There is a few that I can highlight for Your Honor if you want to address them now.

THE COURT:  Well, let's take up sentencing first and then we'll see.

1          MS. SILVER:  Understood.

2          Okay.  So, you know, we filed our memorandum

3     that sort of sets out what Mr. Van Wyk was trying to

4     do when he was released from prison.  I don't think

5     it's any secret that he has a long road to go in

6     terms of rehabilitation, reintegrating into society.

7     And there were steps that he was taking to sort of

8     get his life back on track.

9          He was -- he does have a productive

10    relationship with Community Partners in Action which

11    is a reentry center in Hartford.  He has been working

12    with one of their counselors.

13         He was frustrated by his lack of progress,

14    the lack of immediate progress in terms of getting

15    identification, getting a job.  It wasn't an easy

16    transition for him.  But he knows that it's going to

17    be a long road, that he is trying to reenter society

18    after being in prison for more than 15 years, I

19    think, in terms of actual incarceration time, and

20    that he needs to use the resources of Community

21    Partners in Action, of his probation officer in order

22    to assist him in that transition.

23         I don't see what purpose reincarceration for

24    an additional four months will do in this case.  He's

25    just going to come out in four months, be in the

exact same position that he's in.  I don't think it
will serve any rehabilitative purpose.  He's already
gotten the benefit of that -- the purpose that prison
could -- whatever purpose that prison would have for
him, whatever benefit, he's already gotten that
benefit.

He's been able to use the resources of the
Department of Corrections.  It's the first time in
his life, actually, that he's had access to podcasts
which are a medium that he finds particularly helpful
as opposed to books.  In the BOP, he could not afford
a tablet.  And he's been really invested in trying to
engage in motivational material and material that's
going to help him commit to that journey going
forward.

THE COURT:  All right.  Thank you.

Mr. Van Wyk, you have the right to be heard
today if you wish to say anything.  You don't have to
and you can rely on your lawyer's arguments, if you
prefer.

THE DEFENDANT:  Okay.  Thank you, sir.

THE COURT:  Is that what you'd like to do
or --

THE DEFENDANT:  Sure.

Like Ms. Silver has said, I have listened to

tons of podcasts, motivational, inspirational
podcasts.  Dr. Joe Dispenza is -- actually, I'm a big
fan of his now.

And, you know, I'm working towards being the
person I'm supposed to be and, you know, changing my
life.  Like she said, it's going to be a long road; I
know that.  But I'm dedicated to, you know, going
down that road and working every day to try to be a
better person.

THE COURT:  Very good.  Thank you.

Ms. Krull.

MS. KRULL:  Thank you, Your Honor.

I did submit a very detailed sentencing
memorandum, so I don't have a whole lot to add today,
although I do want to emphasize that in addition to
rehabilitation being a purpose of supervised release,
protecting the public is also one of those purposes.
And given the defendant's history which I've laid out
in detail and the recent conduct both at the
Drapelick Center and his recent conviction are huge
red flags, you know, a danger sign that we should
listen to.  And so that is why I'm supporting the
probation officer's recommendation, in order to
protect the public, because he was only on supervised
release for less than two months when all of this

happened.  And he's saying that he wasn't -- he was

frustrated with the lack of progress.  It was, I

think, approximately six weeks.  And so that's --

that kind of rings hallow if it was such a short

period of time.  It's another red flag that during

such a short period of time, he was already

frustrated with the process of working with

supervised release to work on his plan.

So I'm only here to emphasize the danger to

the community and that protecting the public is a

very important part of supervised release.  And also

with the supervised release conditions that I know we

can get into, but that is also the reason why the

government is proposing such strict conditions.  It's

all about protecting the public from someone who has

shown repeatedly that he is a danger to the public.

THE COURT:  All right.  Thank you.

Ms. Gorton, did you want to say anything?

THE PROBATION OFFICER:  Yes, Your Honor.

I stand by the recommendations in our

sentencing recommendation.  Mr. Van Wyk was on

supervision for a very short period of time.  He was

subject to regular, weekly in-person contacts with

the probation office.  We referred him to the

services that we had hoped would be helpful to him.

He attended them.  Thankfully, he attended
sex-offense-specific treatment when referred.

He also was working regularly on getting a
job.  He was communicating with me.  We had invested
as much as we possibly could with Mr. Van Wyk as far
as paying for his rent, financially providing a cell
phone, as well as some other basic needs that he
needed when he relayed.  So we were invested in his
success, and it's unfortunate we're here today.

This is a Grade C violation.  Our office did
recommend a term of incarceration, and that is in
part because this conduct was brought to the
attention of the police department because a mother
was concerned and concerned that on more than one
occasion, you know, Mr. Van Wyk had participated in
behavior that was concerning to her.

If this had been some other sort of issue,
you know, our office would have happily worked with
him.  We will continue our recommendation of
supervision going forward as well.  We'll continue to
work with him on things when he is challenged.  But
when it results in the concern for safety of a mother
and children in the community, our office does see
the importance of recommending incarceration.

THE COURT:  Did you have a chance to speak

with the mother?

THE PROBATION OFFICER: I didn't, Your Honor.

THE COURT: Okay. Is there any reason to believe that Mr. Van Wyk was aware that a mother with young children lived at the house where he dropped the underwear?

THE PROBATION OFFICER: I didn't see anything in the reports, Your Honor.

THE COURT: Ms. Silver, anything further?

MS. SILVER: I would just note that I believe that the state investigation revealed that there is no evidence that he was aware of that, which is why stalking charges were not pursued by the state.

THE COURT: All right. Well, Mr. Van Wyk, I have to consider the factors in 18 U.S.C. Section 3553(a), other than punishment, when deciding how to deal with this situation.

I will note that the two principal purposes of supervised release are rehabilitation and protection of the public. There is a question in my mind how best to protect the public in a circumstance such as yours, whether locking you up will protect the public long term or only for the period that you're incarcerated, whereas rehabilitation, theoretically, could protect the public for a much

1  longer period of time.

2      I would note a couple of things also about

3  the charged violation.  The conduct you were

4  prosecuted for was breach of the peace in the second

5  degree.  That's a Class B misdemeanor with a maximum

6  sentence in state court of six months.  You received

7  the maximum sentence in state court.  That raises the

8  question whether additional punishment is necessary

9  in the federal court.

10      Interestingly, the breach of peace second can

11  be committed by somebody who fights, assaults or

12  strikes another, threatens to commit any crime

13  against another person, publicly exhibits indecent or

14  abusive material, uses obscene or abusive language in

15  a public place or creates a public and hazardous

16  physical -- physically offensive condition.

17      In my view, dropping underwear on somebody's

18  front lawn is a bad thing to do.  It is obviously

19  criminal in state law.  It's not criminal in federal

20  law.  And the question arises whether you need

21  additional incarceration.  The sentencing guidelines

22  in Chapter 7 have a series, not of guidelines but of

23  policy statements.  Those policy statements suggest,

24  as has been noted, that you serve at least four

25  months in prison for this violation.

I see this violation as misguided, unfortunate, but not especially serious. It was -- it's clear you have a serious problem. It's clear you need to deal with that serious problem, and it's clear that should you do anything with respect to direct connection with a child, you're going to face extremely serious consequences.

You have a sickness or addiction. I mean, I don't know how to describe it. And I think you need to, like a drug addict would, you need to figure out what triggers that addiction, because if you act out, you will be punished. You've been punished already, I think sufficiently punished, by what happened in state court.

There was no physical harm to anybody. There was no -- there is no -- nothing in the record to suggest that the children ever learned of this occurrence. There is nothing to suggest in the record that you understood that the house was inhabited by a woman and her children.

So it's, frankly, weird that you did this. It's concerning that you did this, but I don't think it calls for an additional period of incarceration. In my view, a period of incarceration at this point would only set you back.

1    You obviously have been somewhat unsuccessful

2    so far on supervised release, but the point is you've

3    got connections with an organization that's helping

4    you deal with your reentry.  You're making some

5    efforts to get your driver's license and so forth.

6    Those are all going to get set back if you go to

7    prison.

8    What I want to do is ensure that you are

9    determined to deal with your problems and make sure

10   that you don't harm anybody else.  I think the best

11   way to do that is to get you rehabilitated, not to

12   lock you up for a short period of time.  That's going

13   to do nothing except for those four months.

14   So in sum -- oh, I should also mention, I

15   think your time in state prison was extended because

16   of the federal detainer.  The federal detainer meant

17   you could not receive parole.  I assume you would

18   have received parole at some point.  So you have

19   received, in effect, some term of imprisonment as a

20   result of the bringing of the federal supervised

21   release charges.

22   What you need is mental health treatment, sex

23   offender treatment, and help getting a stable place

24   to live and, hopefully, a stable employment.

25   So, essentially, for those reasons I do not

intend to sentence you to further punishment for the violation that's been charged here.

I do think it's important to take up the modification of supervised release. It sounds like folks are ready to go forward today, so I'm happy to do that if people want to be heard on that question.

First off, let me hear if there is anybody who wants to have a further articulation of the reasons for not imposing an incarceratory sentence.

MS. KRULL: No, Your Honor.

MS. SILVER: No, Your Honor.

THE PROBATION OFFICER: No, Your Honor.

THE COURT: All right. Do you want to start, Ms. Silver?

MS. SILVER: Sure. Like I said, I don't -- there is a lot here that I don't think is particularly novel or dramatically changes his existing conditions. We spoke very briefly on the proposed modification, so I think we are aware where the -- there may be some sticking points. I don't want to harp on this since it's not applicable.

So we have no objections to the proposed conditions as outlined both by probation and in the government's memorandum to Condition 1, Condition 2 --

1          THE COURT:  When you say "Condition 1" --

2          MS. SILVER:  I'm sorry.  I'm referring to the

3   government's.

4          THE COURT:  These are the special conditions?

5          MS. SILVER:  Yes.  Yes.

6          THE COURT:  Not the mandatory or standard

7   conditions?

8          MS. SILVER:  No.  We are not at this time

9   seeking modification to those conditions.

10         THE COURT:  All right.  Let me find out if

11  the government is seeking modification of either the

12  mandatory or standard conditions.

13         MS. KRULL:  No, Your Honor.

14         THE COURT:  Very well.  Did we -- did we.

15  Did the Court, that is, Judge Burns, impose Standard

16  Condition Number 12 which has been changed?  It's no

17  longer -- I have to go back and get an old book to

18  get the --

19         MS. KRULL:  Yes, Your Honor.  I see the

20  judgment.  It says, "The defendant shall not enter

21  into any agreement or act as an informer."  Is that

22  the one you're talking about?

23         THE COURT:  No.  Hold on.  Let me see.

24         Well, if that's Number 12 -- do you have the

25  judgment by any chance?

         MS. KRULL:  Yes.  That's what I'm reading

from.  It's Docket Number 40 on the docket.

         THE COURT:  And what is Number 12?

         MS. KRULL:  Number 12 says, "The defendant

shall not enter into any agreement to act as an

informer or special agent of law enforcement agency

without the permission of the Court."

         THE COURT:  Right.  I think that one is fine.

So they must have changed it before.  Okay.  I'm not

going to worry about that.

         So you don't have any suggested changes to

either mandatory or standard conditions?

         MS. KRULL:  No, Your Honor.

         THE COURT:  All right.  Let's take up the

discretionary or special conditions.

         So no objection to Number 1; is that right?

         MS. SILVER:  No objection to Number 1 either

as outlined by probation or as proposed amended by

the government.  No objection to 1, 2 or 3.

         THE COURT:  I haven't checked the consistency

of the probation office's recommendation and the

government's recommendation.  Are those the same?

         MS. SILVER:  The government has proposed

additional clarifications in the memorandum to the

ones proposed by the probation office, I think in

1 part to bring them in line with some of the language

2 we're using now when we impose these.

3          THE COURT:  So you're -- when you say "no

4 objection to Number 2," you're talking about what the

5 government has proposed?

6          MS. SILVER:  Yes.

7          THE COURT:  That's fine.  Okay.

8          MS. SILVER:  Yes.  I'm going through the

9 government's brief as I do this.

10          THE COURT:  Very good.  So 1, 2 and 3, you

11 said, are all good?

12          MS. SILVER:  Yes.

13          THE COURT:  Okay.

14          MS. SILVER:  With respect to Condition 4,

15 this is not relevant to Mr. Van Wyk as he has no

16 children.  I do just want to note that in order for

17 there to be a restriction on contact with one's own

18 children, there does have to be a specific finding by

19 the Court.  Again, it's not applicable here because

20 he doesn't have children.  But if and when he has

21 children, we would seek to have that modified to

22 either reflect the finding that he is restricted from

23 having contact with his own child or we would seek a

24 modification or clarification of that.  I'm just

25 highlighting that.  It's not applicable here; he does

1    not have children.

2          THE COURT:  Yeah.  So you don't object to

3    Number 4?

4          MS. SILVER:  No.

5          THE COURT:  But you are going to move to

6    modify it in the event that he has -- becomes a

7    father?

8          MS. SILVER:  Yes.  We will reserve our rights

9    to modify on that one.

10         THE COURT:  All right.

11         MS. SILVER:  Six and 7, we have no objections

12    to the proposed modifications.

13         MS. KRULL:  You skipped 5.

14         MS. SILVER:  I'm sorry.  Five is fine.

15         With respect to --

16         THE COURT:  Let me go back to 5.

17         MS. SILVER:  Uh-huh.

18         THE COURT:  Ordinarily, I don't order a

19    search condition except a plain view, if evidence of

20    a violation of supervised release is in plain view.

21    This search condition is much broader than that and

22    includes a search of Mr. Van Wyk's person.

23         So let me hear from the government why a more

24    restrictive condition is appropriate here.

25         MS. KRULL:  Yes, Your Honor.  This

restriction has been approved by the Second Circuit,
I'll start with that. And I'll give you an example
of why this kind of search is -- this kind of
condition is needed, and I'm going to give you an
example of a recent case that our office has.

Not the defendant, in a different case who
had this search condition in a sex trafficking case.
He had failed to register as a sex offender. State
offenders went to his residence to arrest him on that
charge, and when they showed up, he had an iPhone in
his hand, and he was talking to his mother on the
iPhone.

Well, there was a condition saying that he
was not supposed to have any unmonitored devices, and
that device was not one of the ones that probation
knew about. And based on that, there was a
reasonable suspicion that he had possession of at
least one device, if not more.

So after he went to court and got released on
bond for that offense, probation then went in and did
a search to find that iPhone. And not only did they
find that iPhone, but they found, I believe, five or
six other devices hid in his bedroom, all of which
were not monitored by probation.

So that's an example of a reasonable

1    suspicion search that could happen under here, why we

2    need such a thing, because the defendant did do --

3    did commit his crime using the Internet when he

4    enticed a child to engage in sexually explicit

5    activity, also to use the Internet to extort that

6    child with threats to continue to do that conduct or

7    else he would expose her videos.  And so this

8    conduct, he's actually using electronic devices.  So

9    that's an example that reasonable suspicion could

10   cause a search.

11          And I want to point out, Your Honor, too,

12   that there was consultation with the U.S. Attorney's

13   Office about doing a warrant, but we didn't have

14   probable cause.  There was no probable cause of a

15   crime.  We didn't know that he was using the device

16   to engage in contacting a child.  We only knew that

17   it was a violation of a condition.  So that's a

18   reasonable suspicion that would fall under this.

19          THE COURT:  Right.  Okay.  But what you've

20   described is a -- evidence of a violation in plain

21   view.  They walk in, they see him on the iPhone,

22   so --

23          MS. KRULL:  They did not though.

24          THE COURT:  I thought you just said that.

25          MS. KRULL:  Well, I'm saying that they later

1  got a video that said that.

2         THE COURT:  Yes.  Yes.

3         MS. KRULL:  I mean, what if it was a

4  confession?  Which he did confess.  What if they --

5  he told the police?

6         THE COURT:  Maybe you misunderstand my

7  concern.  What searching the person includes is when

8  the probation officer shows up, they can pat him

9  down, tell him to empty his pockets, tell him to

10 strip if they want to.  Why is that any of that

11 necessary?

12        MS. KRULL:  Because he's a danger to the

13 public, and he has very much established that danger.

14 And we're talking about reasonable suspicion here,

15 not based off of a hunch or a guess.

16        THE COURT:  Slow down.  Slow down.  If you

17 get reasonable suspicion, why do you need to search

18 his person?

19        MS. KRULL:  Because what if he has the phone

20 in his pockets, or what if he has it hidden somewhere

21 on his person.  That's the purpose of that:  It's not

22 in his bedroom; it's on his person.

23        I mean, if we want to include restrictions

24 that they can't do a strip search, that's fine.  I

25 don't think anybody is contemplating a strip search

1  so we can limit that.  We can put limitations in the

2  condition.

3       He's been deemed high risk by his sex

4  offender treatment program, the evaluation.  He is a

5  high-risk offender.  The only reason the government

6  is seeking such strict conditions is because he is

7  such a high risk to children that he has repeatedly

8  demonstrated in multiple ways:  in-person contact in

9  addition to contact over the Internet.  We don't ask

10  for this condition across the board.  It's because of

11  the specific nature of this defendant and his risk to

12  children.

13       MS. SILVER:  It's been my experience that the

14  U.S. attorney's office asks for this condition in

15  every case involving possession or production of

16  child pornography.  So I don't know if it's an

17  individual assessment.  And it's something we're,

18  generally, in my office required to agree to as part

19  of the plea agreement.  It's not something that we

20  have the opportunity to argue.  We do here.

21       I do want to just note, I did say we did not

22  have any objection.  This is one area we're kind of

23  toggling back and forth between the brief and the

24  judgment, may have been misleading.  The original

25  condition is reasonable suspicion for the presence of

sexually explicit materials involving minors, so it's
a little bit more narrow than the one that's being
proposed here. And I wasn't -- I'm not sure what --
how these are supposed to be modified together, the
language that is quite being proposed.

But the other thing I just want to flag is
that the reason that Mr. Van Wyk did not have an
initial reaction to this is because he is not
interested in trying to hide things from the
probation office. The reason we know he was deemed
high risk is because he is going to sex offender
treatment. He is meeting with probation when he's
supposed to.

THE COURT: All right. Thank you.

So where are we now? Number 6, do you agree
to that?

MS. SILVER: Six is -- I don't think there is
a modification proposed and it's a state and local
federal requirement, there is no objections there.

THE COURT: Of course. All right.

MS. SILVER: Number 7, this is the financial
records.

THE COURT: Yeah. I -- go ahead.

MS. SILVER: I mean, it might be overly broad
here. This is, again, not something that Mr. Van Wyk

1  feels like he is -- the hill he wants to die on,

2  again, because he is not interested in hiding things.

3  The proposed amendment by the government just adds a

4  little more clarification for the purpose, but ...

5      THE COURT:  Well, let me hear from the

6  government.  I don't see -- I mean, the financial

7  records condition is normally imposed in a case

8  involving restitution obligations or fine

9  obligations.  Why is it appropriate here?

10      MS. KRULL:  This is a condition that was

11  imposed by Judge Burns in 2012.

12      THE COURT:  Right.

13      MS. KRULL:  We are concurring with that only

14  -- as noted by counsel, only adding additional

15  language to expand on the purpose which is listed

16  there.  It goes hand in hand with some of the other

17  conditions here as an enforcement mechanism in order

18  to determine whether the defendant is lying to

19  probation about whether he purchased any software,

20  equipment or services designed to block or circumvent

21  computer monitoring software or purchase child

22  pornography or purchase access or to have contact

23  with minors, all of those things can be shown on

24  financial records.  Different types of things can be

25  purchased.  We've seen it.  I've seen it in

 1 investigative cases where defendants actually have

 2 purchased child pornography using their own bank

 3 accounts.

 4      And here, in addition to that, which people

 5 might say, well, he's not going to do that, that's

 6 too obvious, it's the trying to get around the

 7 monitoring software.  I mean, he is saying that he's

 8 not going to do that, but we have seen in other cases

 9 where defendants actually do that.

10      And so one of the ways to try and monitor to

11 see if that has been done is to look at the financial

12 records to see his purchase history, to see if

13 there's anything suspicious about that, what he's

14 ordering on Amazon, if he's ordering any suspicious

15 software from certain sites where he can download it.

16 It's just to monitor whether or not he is abusing his

17 computer access.

18      And I keep coming back to his high risk.

19      THE COURT:  Yeah.

20      MS. KRULL:  He used the computer to commit

21 his underlying crime.

22      THE COURT:  But -- I agree.  And there ought

23 to be computer restrictions.  But the financial

24 restrictions don't add anything and they're

25 unbelievably intrusive.  Anybody with half a brain

could circumvent this condition, and what that leaves

you with is just completely going through all his

financial records which -- or the probation office

going through his financial records, which serves no

purpose.  It's intrusive.  It doesn't help you.  He

is not going to -- he is not going to use a credit

card to buy this software.

MS. KRULL:  I've seen it, Your Honor.  It

happens.  I've seen it.

THE COURT:  Well, all right.  I'm not going

to impose Number 7.  In fact, I'm going to eliminate

the financial condition from the judgment.  Thank

you.

What about 8?

MS. SILVER:  Yes.  This is one that I do view

as a significant change to his proposed conditions.

His original conditions that he shall not loiter

around playgrounds, schools or arcades or other

places where children under the age of 18 congregate

and the proposed conditions that he shall not be in

those areas, and you are -- shall avoid and are

prohibited from being in any location where children

under the age of 18 are likely to congregate.

We have issues with this condition with

almost all of our clients who are on supervised

1     release that are sex offenders.  It's very confusing

2     to people what is an area -- prohibiting someone from

3     being in an area where children are likely to

4     congregate can mean that you cannot walk outside your

5     house if there's a park.  And it's not even about

6     going to the park.  It's about just walking by it,

7     because you're required to avoid that.  You're

8     required to avoid a restaurant where children might

9     go.  You're required to avoid going to the mall or

10     the movies.  I mean, it's just a very vague

11     condition, and a lot of our clients really do

12     struggle to understand exactly what that means.  It

13     requires a lot of going back and forth with the

14     probation office.

15          The language that we would propose in lieu of

16     that would be that the restriction that restricts

17     Mr. Van Wyk from being in places or -- primarily used

18     for children such as schoolyards, playgrounds and

19     arcades, which I think is really what this condition

20     is trying to get at.  He knows he can't go to a

21     playground, so that's not the question.  It's being

22     in an area where children are likely to congregate

23     versus being in an area that is primarily used by

24     children.

25          THE COURT:  I would add schools to your list.

MS. SILVER: Yes. Schoolyards. The example
I'm using, it comes from a case *United States v.*
*Dupes*, 513 F.3d 338, second circuit. It's places
primarily used for children such as schoolyards,
playgrounds and arcades, so certainly schools would
be on that list.

THE COURT: Any opposition to the proposed
amendment?

MS. KRULL: Yes, Your Honor. The proposed
modification here is based on current language used.
It's also to avoid any argument as to what loitering
means, because one person's loiter can be another
person's just walking by. And I thought that that
language -- and I think that's the reason why it was
changed from the way it was used in 2012 to be more
specific and so the defendant would have more
guidance as to what he actually could and could not
do.

The other thing I want to make note for the
record, Your Honor, is that the defendant had a
similar condition in place in his Arizona case, and
he was violated because he went to one of those
specific places: an arcade. He tried to get a job
at an arcade where children congregated. So this is
a very important --

1          THE COURT:  When he was 24.

2          MS. KRULL:  Correct.  And when he was

3   convicted of sexually molesting several children in

4   person when he worked for the Boys & Girls Club in

5   Arizona.  And so I just want to note that for the

6   record, that he has a history and that this condition

7   is very important.

8          THE COURT:  Okay.  Well, the proposed

9   amendment deals with a loitering problem, doesn't it?

10         MS. KRULL:  I was trying to avoid the

11  vagueness of this term "loiter" by getting a more

12  specific --

13         THE COURT:  Yes.  She doesn't suggest using

14  the term "loiter," does she?

15         MS. KRULL:  No.

16         THE COURT:  Okay.  So the issue is whether

17  there should be greater clarification, not just about

18  loitering but also about where he is permitted to go.

19  "Where children congregate" is not helpful.  Children

20  congregate many, many, many places.  So I think the

21  better way to go is to adopt the proposed edits to

22  the condition.

23         MS. KRULL:  Understood, Your Honor.

24         THE COURT:  All right.  Number 9, I assume no

25  objection.

1        MS. SILVER: No objection. I'm sorry. I'm

2 just --

3        THE COURT: I assume no objection to 10?

4        MS. SILVER: Let me just pull up the judgment

5 again.

6        No. No, of course not.

7        THE COURT: No objection to 11?

8        MS. SILVER: No. The one thing I just wanted

9 to make sure that I understood, and maybe this is

10 where Officer Gorton might provide some guidance, is

11 what it means for probation to supervise here the

12 implication of mental health treatment. The reason I

13 am flagging this is because often in cases where

14 there is sex offender treatment specifically, it's

15 very clear that that's about risk management and that

16 the probation officer will have, essentially, full

17 access into the records.

18        And with mental health treatment, it is more

19 for the benefit of the individual, and having the

20 probation officer have full view of what someone

21 tells their therapist can be detrimental to actually

22 receiving the benefit of the mental health treatment.

23        THE COURT: Well, I don't understand that

24 there is going to be a recording of what Mr. Van Wyk

25 tells his therapist. I mean, what they're talking

about is having access to did he attend therapy as he
was required to, is he going to an approved therapist
or some quack.

MS. SILVER:  Those things we have no
objection to the probation office having insight.
It's been my experience that this can sometimes mean
that the probation officer receives the treatment
notes which would include disclosures about childhood
trauma, about thoughts that they might be having that
they should be discussing in therapy; that's the
place to bring it out.  But when you get those
treatment notes are given to the probation officer,
it -- that is what I'm talking about as being the
barrier here.

In terms of going and attending and that it's
going to a person that's approved, there is no
objection there.

THE PROBATION OFFICER:  Your Honor, good
morning.  I think the terminology "treatment note"
has somewhat gotten confused and in a variety -- in
both realms, in both sex-offense-specific treatment
and mental health treatment.

So our provider, unfortunately -- our
sex-offense-specific provider calls an update
"treatment notes."  And what's that about is

1  risk-related discussions during a person's treatment,

2  you know, certain risk factors relative to that.  But

3  it's not an all-encompassing full, you know,

4  disclosure of what the person said in treatment.

5  It's relative to their risk.  So that's what happens

6  in sex-offense-specific treatment.

7         Mental health treatment in Mr. Van Wyk's case

8  would assist him with various mental health symptoms.

9  It would encompass us receiving information about the

10  clinician, whether or not they're valid to practice

11  in Connecticut, information about Mr. Van Wyk's

12  diagnosis, his treatment goals.  And that's the

13  extent of it unless there was some sort of

14  third-party risk concern or some concern for his own

15  safety.

16         So that's what the purpose of mental health

17  treatment is in this type of case.  It does involve

18  collaboration between the two therapists to help.  We

19  want to help Mr. Van Wyk so that his clinician is not

20  suggesting something that might be problematic to

21  others.

22         THE COURT:  I get the need.  The question is

23  what access you'll have if you're supervising the

24  mental health treatment.  Does that mean you get the

25  substance of what he's telling his therapist?

1           THE PROBATION OFFICER:  No, Your Honor.  We

2    receive treatment diagnosis, treatment goals and

3    prognosis and treatment.

4           THE COURT:  Okay.  We can make that part of

5    the condition.

6           MS. SILVER:  And to the extent that we have

7    any issues, that might be something that we seek to

8    modify at a later date.  It's a little premature at

9    this point.

10           THE COURT:  All right.  I have a problem with

11    Number 12, so let me hear from the government or

12    probation why that's necessary.

13           MS. KRULL:  Your Honor, is there a particular

14    part of it?  Is it the time frame, is it at all --

15           THE COURT:  It's the location monitoring.

16           MS. KRULL:  Just in general?

17           THE COURT:  Yeah.  I mean, in other words,

18    how does that -- how does that help either

19    rehabilitation or protection of the public?

20           MS. KRULL:  For example, Your Honor, it would

21    help protection of the public so that the probation

22    officer can know if the defendant is actually

23    violating these conditions, in particular if he is

24    going to a playground, if he is going to an arcade.

25    The GPS monitoring can determine that, and that will

aid in protecting the public.

It will also aid in his rehabilitation because then probation can have those conversations with the treatment provider and with the defendant himself. Given the nature of the underlying crime and his violations recently, including the fact, you know, we've been talking about the underlying crime but we -- I mean, the recent violation crime.

But, also, I don't want it to be lost that he was basically kicked out of the Drapelick Center and banned from ever returning because -- and that was just recently in August.

THE COURT: And you knew where he was at that time, so location monitoring would not have helped that problem.

MS. KRULL: Because he was in that -- but he's not going to be in that forever.

THE COURT: Of course. But my point is, he did that when you knew where he was. So if you know he's in his home, how does that help you? Or you know he's gone to the grocery store, or you know he's, whatever, going to work, how does that -- how does knowing where he is promote the safety of the public? It doesn't. You're making guesses.

MS. KRULL: I don't know how else to say it

1   other than if he goes to a prohibited place, then

2   probation will know.  You're assuming that he's going

3   to places that are not problematic, but we don't

4   know.  That's the whole purpose of GPS monitoring, to

5   make sure -- and it's a limited period.  It's only

6   six months.  It's not for the entire term or two

7   years.  It's to make sure that the public is

8   protected because of his high risk to the community,

9   that he's not going to those prohibited places that

10  he has gone to in the past.

11          THE COURT:  Yeah.

12          MS. KRULL:  And so, I mean, we're assuming

13  that he is going to be perfect on supervision when we

14  know just recently last year he was violating and he

15  wasn't perfect, and I don't think that's a fair

16  assumption to make.

17          THE COURT:  I am making no assumption that he

18  is going to be perfect.  If he were to be perfect, he

19  would be the first sex offender who has started his

20  rehabilitation and is perfect.  It's not going to

21  happen.  He's not going to be perfect.

22          But the point is, location monitoring is

23  extremely intrusive, it's expensive and it doesn't

24  help.  It does not help.

25          MS. KRULL:  It helps to know where he is so

that he's not abusing a child like he has in the

past.  He has physically touched, molested children

in the past.

THE COURT:  And if he's in his home abusing a

child, it will not trigger.  There will be no way for

the GPS to say, hey.

What you want is you want a video.  You want

him to walk around with a video so you know he's not

molesting a child here, he's not molesting a child

there.  The GPS is not going to tell you anything

that's helpful to that.  He is not going to molest a

child at a playground.

MS. KRULL:  Excuse me?  Yes, he might.  He's

a high risk.  He molested a child not at home last

time.  He molested children at the Boys & Girls Club

and at a daycare.

THE COURT:  Inside a buildings -- inside

buildings.

MS. KRULL:  An arcade is a building.

THE COURT:  Yes, it is.

MS. KRULL:  And it would be very helpful to

know, via GPS, if he is going to an arcade like he

has in the past.

THE COURT:  All right.  I understand.

I'm not going to impose Number 12.

1          All right.  Any others that you suggest?

2          MS. SILVER:  We have nothing further.

3          THE COURT:  So let me ask that probation

4    prepare -- or we can prepare an order, it doesn't

5    matter, but --

6          THE PROBATION OFFICER:  Your Honor, I can

7    prepare the judgment.

8          THE COURT:  All right.  Let me ask you to

9    confer with both counsel and submit it after you've

10   done that so that I understand if there is agreement

11   or not on the proposal that you --

12         THE PROBATION OFFICER:  Yes, Your Honor.

13         THE COURT:  Thank you.  All right.

14         So just to be clear, the judgment on the

15   violation will not include any additional punishment.

16   The state has adequately punished Mr. Van Wyk for the

17   conduct giving rise to the state offense which is the

18   only basis for the federal violation charge; however,

19   we are going separately monitor -- excuse me, modify

20   the supervised release conditions to reflect the

21   discussion that we have just had.

22         Let me hear from either counsel if there is

23   any reason why that sentence cannot lawfully be

24   imposed.

25         MS. KRULL:  No objection, Your Honor.

1   Nothing.

2         MS. SILVER:  No.  No objection, Your Honor.

3         THE COURT:  All right.  Mr. Van Wyk, the

4   judgment I've just described is imposed as the

5   judgment regarding your supervised release violation.

6   You have the right to appeal if you choose to.  You

7   have to file a notice of appeal within 14 days.

8         Do you understand that time limit?

9         THE DEFENDANT:  Yes, sir.

10        THE COURT:  If you wish to appeal but you

11  cannot afford to do so, you can file a motion to

12  proceed in forma pauperis.  If that motion is

13  granted, the Court will waive the filing fee for your

14  appeal and will appoint a lawyer to handle your

15  appeal at no cost to you.

16        Do you understand?

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  So let me just be clear.  You

19  need to get your act together.  You need to figure

20  out what your triggers are, you need to avoid that,

21  those things.  You need to figure out how best to get

22  back to being a productive person in our society.

23  You've got a lifetime of supervised release.  As

24  you've heard today, those conditions of supervised

25  release can be very onerous.

So if you want the rest of your life to be subject to onerous conditions, just keep acting out. If you want to go back to prison for violating your supervised release, just keep acting out. We can send you back there real quick. There is no jury trial right, no right to confront witnesses, no proof beyond a reasonable doubt requirement. It is amazingly easy to send people to prison for violating supervised release.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Yeah. It could be done in a matter of days. So you've got choices ahead of you. You can do the hard work to get yourself together, deal with your mental health problems, deal with your sex offender problems, and have some hope for a future life.

Or you can -- you heard the prosecutor, right? You can keep doing what you're doing, and you'll be prosecuted either for a violation or for violation of law. A violation of supervised release is easy. A violation of law is harder. But there you go.

Am I getting through to you?

THE DEFENDANT: Yes, sir, you are.

1    THE COURT:  Work with Ms. Silver.  I hope you

2  find some housing.  I hope you find a job and I wish

3  you good luck.  Stay out of trouble, sir.

4    THE DEFENDANT:  Thank you.

5    THE COURT:  We'll stand in recess.

6    (PROCEEDINGS ADJOURNED, 11:02 a.m.)

7

8    C E R T I F I C A T E

9

10  RE: UNITED STATES OF AMERICA v. WILLIAM SCOTT VAN WYK
                No. 3:11-cr-00213-SRU-1

11

12    I hereby certify that the within and

13  foregoing is a true and accurate transcript taken in

14  the aforementioned matter to the best of my skill and

15  ability.

16

17    /s/_Melissa J. Cianciullo_____

18    MELISSA J. CIANCIULLO, RDR, CRR, CRC
              Official Court Reporter
19          United States District Court
              915 Lafayette Boulevard
20            Bridgeport, CT 06604
                (203) 606-1794

21

22

23

24

25